# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | |
|---|---|
| United States of America<br>v.<br>MATTHEW DERRICK HUDSON<br><br>*Defendant(s)* | )<br>)<br>) Case No. 3:25-mj-71131 MAG<br>)<br>)<br>)<br>) |

**FILED**
Sep 19 2025
Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  July 2020 through October 2022  in the county of  San Francisco  in the
Northern District of  California , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Count One: Wire Fraud<br>Max. Penalties: 20 years' imprisonment; a $250,000 fine, or twice the gross pecuniary gain or loss from the offense; 3 years supervised release; $100 special assessment |

This criminal complaint is based on these facts:

See the attached affidavit of FBI Special Agent Deidre Lund.

☑ Continued on the attached sheet.

Approved as to form /s/ Patrick O'Brien
　　　　　　　　　　AUSA Patrick O'Brien

Sworn to before me by telephone.

Date: 09/18/2025

City and state: San Francisco, CA

/s/ Deidre Lund
*Complainant's signature*
Deidre Lund, FBI Special Agent
*Printed name and title*

*Judge's signature*
Hon. Alex G. Tse, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Deidre Lund, a Special Agent with the Federal Bureau of Investigation, being duly sworn, hereby declare as follows:

**OVERVIEW AND AGENT BACKGROUND**

1. I make this affidavit in support of a Criminal Complaint against MATTHEW DERRICK HUDSON ("HUDSON") alleging the following violation:

   a. Count One: Wire Fraud for an investment fraud scheme that HUDSON orchestrated beginning on a date unknown but no later than in or about July 2020 and continuing through in or about October 2022 in connection with HUDSON's former company, Invenia Technical Computing Corporation ("Invenia"), in violation of 18 U.S.C. § 1343.

For the reasons set forth below, I believe there is probable cause to believe HUDSON has committed the foregoing violation of federal law.

2. I am familiar with the facts and circumstances of this investigation through my participation in it as well as my review of documents and records, meetings with witnesses, and conversations with other law enforcement agents and officers and regulators. The statements contained in this affidavit come from my personal observations, my training and experience, information from records and databases, and information obtained from other agents, witnesses, and regulators. This affidavit summarizes such information to show that there is probable cause to believe that HUDSON committed the federal criminal violation listed above. This affidavit does not purport to set forth all my knowledge about this matter or to name all the persons who participated in these crimes. This affidavit also reflects my current understanding of facts based on my participation in this investigation, but that understanding may change as the investigation continues.

3. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since August 27, 2023. I have had intensive training in law enforcement

1

investigation techniques for approximately sixteen weeks while assigned to the FBI New Agent Training Course at the FBI Academy in Quantico, Virginia.

4.      Since I graduated from the FBI Academy in January 2024, my duties and responsibilities included conducting complex financial crimes investigations, including wire fraud, investment fraud, securities fraud, corporate fraud, and insider trading. I have had the opportunity to work with multiple investigative partners including Customs and Border Protection and the Internal Revenue Service. I also have experience in joint operations with Department of Homeland Security ("DHS") organizations such as Immigration and Customs Enforcement ("ICE")—to include Enforcement Removal Operations ("ERO")—and Homeland Security Investigations ("HSI") through the FBI Title 8 Immigration authority.  Currently, I am assigned to the FBI Title 8 Criminal Squad in San Francisco, CA, where my responsibilities include investigating federal immigration violations, narcotics violations, human trafficking violations, and fugitive operations.

## APPLICABLE LAW

5.      Title 18, United States Code, Section 1343 prohibits wire fraud.  The essential elements of this offense are: (1) the defendant knowingly participated in, devised, or intended to devise a scheme or plan to defraud for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts with a duty to disclose; (2) the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; (3) the defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and (4) the defendant used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme.  For defendant to commit wire fraud based on a scheme to induce a victim to enter a bargain, the false or fraudulent pretenses, representations, promises or omitted facts must directly or indirectly deceive the victim about the nature of the bargain.  A misrepresentation will go to the nature of the bargain if it goes to price or quality, or otherwise to essential aspects of the transaction.

## FACTS SUPPORTING PROBABLE CAUSE

### *Summary of the Scheme*

6.  Between in or around 2020 to in or around 2022, Invenia, a private company based in Canada and the United Kingdom, raised and obtained over $100 million from outside investors, some of whom were located in or had representatives located in the Northern District of California and other parts of the United States. Prior to their investments, these investors understood Invenia to be a cutting-edge company applying artificial intelligence and machine learning solutions to inefficiencies in North American energy markets. Invenia claimed a mission focused not only on financial success and technological advances but also on positive environmental and social benefits that would result from more efficient energy markets. Investors were led to believe that Invenia had already achieved significant financial success and expected further growth, with substantial and growing revenues and cash balances each exceeding hundreds of millions of dollars, among other financial metrics. But unbeknownst to these investors, Invenia's Chief Executive Officer and founder, HUDSON, a Canadian citizen and resident of the United Kingdom, orchestrated and engaged in a scheme to defraud Invenia's investors to obtain their money through lies and false, fraudulent, and misleading representations about Invenia's financial performance.

7.  Based on my review of records and discussions with witnesses, I understand that HUDSON's pitch to investors was that Invenia had developed software using artificial intelligence around forecasts of electricity usage for the United States utility grids from available power grid and other data. The business idea was to use data from the grids to monetize on day ahead information provided from Independent System Operators ("ISOs"). The way Invenia built their software allowed for utilities to save the grids and constituents costs. Portions of the cost savings would be the basis for Invenia revenue by predicting the daily usage. Investors were drawn to Invenia's proprietary algorithm that predicted the demand of the energy systems. Investors were also attracted to Invenia's positive financial performance, as relayed to them by HUDSON.

8. As part of the scheme, HUDSON sent, and caused to be sent, false, fraudulent, and misleading financial statements and information to Invenia's investors. These sometimes took the form of fabricated audit reports and third-party invoices, as further described below. HUDSON also in some instances used other peoples' names to distribute additional false, fraudulent, and misleading financial information about Invenia. The falsified financial information provided to investors by HUDSON, including through email accounts other than HUDSON's email account and through which he impersonated other people, was a significant and material factor leading investors to invest in Invenia.

9. HUDSON used false, fraudulent, and misleading statements to cause multiple investors, including two venture capital firms based in the Northern District of California, Investor 1 and Investor 2, to send interstate and foreign wire transfers to Invenia's bank account in Canada. Investor 1 invested approximately $1 million pursuant to a warrant on or about March 10, 2021. Investor 2 invested approximately $80 million in Invenia's Series B round across a series of wire transfers between on or about December 28, 2020, and on or about March 19, 2021. Other investors participated as well, with the total Series B investment round exceeding $85 million in investments.

### *Background on Invenia*

10. Based on my review of investment materials and investor diligence memos, as well as my participation in interviews of witnesses, I know the following background information about Invenia and the industry in which it operated.

11. Founded in 2006, Invenia was a private company that described itself as using artificial intelligence and machine learning in the context of North American energy grids and related markets. Within North America, ISOs and Regional Transmission Organizations ("RTOs") coordinate, control, and monitor electricity grids within defined geographic areas. ISOs and RTOs provide non-discriminatory transmission access and facilitate communication and competition among electricity providers, utilities, and other market participants. In these markets, some participants generate electricity, some participants provide electricity to end users,

and some participants serve as middlemen that trade power. Platforms for ISOs and RTOs allow these various participants to collaborate and communicate. ISOs and RTOs seek a market in which supply and demand match. One way to accomplish a more efficient market is through a day-ahead market, which allows for better planning among participants and less price volatility, among other benefits.

12. Invenia claimed that it could deploy a unique machine learning platform in the day-ahead markets. According to Invenia, it used large proprietary datasets to engage in energy trading and claimed its trading was better and more efficient than trading of other market participants. Financial and economic benefits from its business approach were not Invenia's only stated goals. According to an Invenia board presentation circulated by HUDSON in December 2021, Invenia claimed lofty social and environmental ambitions as well: "We optimize the economic, environmental, and human health impacts of the grid, to maximize the benefits for society."

13. Invenia engaged with energy markets in large part through its relationship with Energy Company 1, a company based in North Dakota. As part of that relationship, Invenia would post cash as collateral with Energy Company 1, and Energy Company 1 would make trades in energy markets based on instructions from Invenia. Individual 1, who managed the Invenia relationship for Energy Company 1, sent Invenia periodic invoices and updates describing the results of Energy Company 1's trades with various ISOs made on Invenia's behalf and based on Invenia's instructions. These invoices and updates also described Invenia's net proceeds after various fees deducted from ISOs and Energy Company 1 as well as funds available for Invenia going forward.

14. Based on documents and communications I have reviewed in this investigation as well as information provided by multiple witnesses, including former board members and former employees, during the relevant period, HUDSON served as the main point of contact at Invenia for potential and existing investors, including being the primary contact for representatives of

Investor 1 and Investor 2. Representatives of Investor 1 and Investor 2 also served on Invenia's board of directors following their respective investments.

### *HUDSON Overstated Invenia's Cash, Revenue, and Other Financial Metrics to Investors, Including by Using Falsified Audit Reports and Invoices*

15. As part of this investigation, the FBI has obtained business and financial records from Invenia, its investors, its partners, and other third parties. Based on my review of communications and interviews with several investors, including representatives of Investor 1 and Investor 2, I believe that Invenia investors received false, fraudulent, and misleading financial information in connection with Invenia's Series B fundraising round. I have not described each and every misrepresentation that HUDSON made or that I am aware of in this affidavit.

16. As reflected in the examples below and information provided to specific investors, there is probable cause to believe that HUDSON intended to convey the message to existing and potential investors that Invenia was a growing company with large, growing revenues and gross profits, and large, growing cash balances, some of which was used as collateral for Invenia's energy trading.

17. Multiple witnesses have reported and other records reflect that HUDSON controlled communications from and with investors, including board members, individuals who worked for Invenia, and other witnesses. For example, HUDSON told a representative of Investor 1 that the reason they could not contact Energy Company 1 was because he did not want them to 'spook' Energy Company 1. I have also reviewed an August 2022 voicemail that a representative of Energy Company 1 left for consultants working for Investor 2 stating that Energy Company 1 had been instructed by Invenia to not provide information to Investor 2's consultants. I believe that these efforts by HUDSON to limit communications between investors and Invenia's employees and business partners was intended to prevent the investors from discovering true financial information about Invenia.

18.     Investor 1, a venture capital firm based in San Francisco, had a representative on Invenia's board of directors following Investor 1's Series A investment in Invenia. Communications between HUDSON and the Investor 1 representative reflect that HUDSON sent false, fraudulent, and misleading information to Investor 1 in advance of Investor 1's March 2021 wire transfer to Invenia. For example, on July 20, 2020, HUDSON sent the Investor 1 representative on Invenia's board of directors a series of financial updates, including a note that said with respect to June statements, "We broke $38M gross as I mentioned, which is a record month!" I have reviewed the financial statements attached to that email, which are unaudited spreadsheets, and the column with the label "Actual" for June 2020 revenue is listed as approximately $38,047,183. I have also reviewed audited financial statements for 2020 prepared by a Canadian audit firm, which was issued the following year, on April 30, 2021. That report reflects that Invenia's *annual* revenue for the entirety of 2020 was approximately $25,537,056, and therefore I believe that the $38 million June 2020 revenue figure was false and significantly overstated Invenia's revenue to Investor 1.

19.     In another example, on or about September 3, 2020, HUDSON emailed a draft version of a 2019 audit report for Invenia to Investor 1's representative on Invenia's board of directors. I have compared the draft audit report that HUDSON sent to Investor 1's board representative to the actual audit report prepared and produced by Invenia's Canadian auditor. The draft audit report that HUDSON sent was manipulated in several material respects, including by making material changes to Invenia's cash, revenue, and net gain. I have included excerpts below of the fabricated 2019 draft audit report sent to Investor 1's representative and the genuine 2019 audit report produced by the audit firm. Based on my review of the genuine audit report and my training and experience, I believe it reflects currency figures using Canadian Dollars.

*Excerpts from Fabricated Draft 2019 Audit Report Sent by Hudson*

**INVENIA TECHNICAL COMPUTING CORPORATION**

**CONSOLIDATED BALANCE SHEET**

**DECEMBER 31**

| ASSETS | 2019 | 2018 |
|---|---:|---:|
| **Current assets:** | | |
| Cash and cash equivalents | $ 218,344,911 | $ 60,693,461 |
| Accounts receivable (Note 3) | 106,522 | 184,006 |
| Government remittances receivable | - | 63,715 |
| Investment tax credits recoverable (Note 4) | 669,408 | 733,674 |
| Prepaid expenses and deposits | 2,478,951 | 735,823 |
| | 221,599,792 | 62,410,679 |
| **Property and equipment** (Note 5) | 2,354,791 | 521,647 |
| | $ 223,954,583 | $ 62,932,326 |

**INVENIA TECHNICAL COMPUTING CORPORATION**

**CONSOLIDATED STATEMENT OF OPERATIONS**

**FOR THE YEAR ENDED DECEMBER 31**

| | 2019 | 2018 |
|---|---:|---:|
| **Revenue:** | | |
| Grid optimization revenue | $ 294,512,621 | $ 96,308,223 |
| **Energy transaction expenses:** | | |
| Earnings participation entitlements | 817,548 | 12,990,603 |
| Grid optimization fees | 112,749,846 | 43,292,862 |
| | 113,567,394 | 56,283,465 |
| **Net gain on grid optimization** | 180,945,227 | 40,024,758 |

8

*Excerpts from Genuine 2019 Audit Report*

**INVENIA TECHNICAL COMPUTING CORPORATION**

**CONSOLIDATED BALANCE SHEET**

**DECEMBER 31**

|  | 2019 | 2018 |
|---|---|---|
| **ASSETS** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 6,349,579 | $ 16,079,867 |
| Accounts receivable (Note 3) | 173,589 | 154,453 |
| Government remittances receivable | 30,932 | 63,715 |
| Investment tax credits recoverable (Note 4) | 669,408 | 1,093,639 |
| Prepaid expenses and deposits | 1,330,358 | 718,948 |
|  | 8,553,866 | 18,110,622 |
| **Property and equipment** (Note 5) | 2,379,988 | 526,252 |
|  | $ 10,933,854 | $ 18,636,874 |

**INVENIA TECHNICAL COMPUTING CORPORATION**

**CONSOLIDATED STATEMENT OF OPERATIONS**

**FOR THE YEAR ENDED DECEMBER 31**

|  | 2019 | 2018 |
|---|---|---|
| **Revenue:** | | |
| Grid optimization revenue | $ 25,511,598 | $ 33,699,411 |
| **Energy transaction expenses:** | | |
| Earnings participation entitlements | 201,856 | (801,471) |
| Grid optimization fees | 25,185,417 | 34,771,276 |
|  | 25,387,273 | 33,969,805 |
| **Net gain(loss) on grid optimization** | 124,325 | (270,394) |

Based on the review of these documents, I believe that HUDSON knowingly communicated to Investor 1 that, among other things, that Invenia had a "net gain" in 2019 of more than $180 million, when the company's auditors actually determined a "net gain" in 2019 of about $124,325.

20.     Investor 2 has reported to the FBI that it also received false, fraudulent, and misleading financial information about Invenia in connection with Investor 2's Series B investment in Invenia, which totaled approximately $80 million in transfers to Invenia between December 2020 and March 2021.  Contemporaneous communications that I have reviewed

9

indicate that Investor 2 received diligence materials and information through a data room populated by Invenia as well as in communications with HUDSON. In one exchange from December 21, 2020, roughly one week before Investor 2's first wire transfer in the Series B fundraising round, HUDSON told an Investor 2 partner that Invenia was raising capital because Invenia was "about US$80M capital constrained despite all the cash we have, it's almost entirely linked to our risk management, driving volume increases," reflecting HUDSON's efforts to portray Invenia as a company sitting on large amounts of cash and engaging in large amounts of trading. I believe those representations were false, fraudulent, and misleading. As reflected in the 2020 audit report described above in paragraph 19, Invenia's cash and cash equivalents for the year ending December 31, 2020—a date shortly after the exchange with the Investor 2 partner above—was only approximately $11,070,329 (which I believe to be in Canadian Dollars). Investor 2 has produced documents to the FBI reflecting materials provided by Invenia through the data room and Investor 2's contemporaneous analysis of that information as reflected in internal Investor 2 communications and memos, showing that Investor 2 received and relied on false, fraudulent, and misleading information about Invenia in the runup to the Series B investment. For example, one Investor 2 partner wrote in an internal email on December 10, 2020, approximately two and a half weeks before Investor 1's first Series B investment, that Invenia had a "400M gross revenue run-rate." In another internal email from a few days later, a different Investor 2 partner reported that Invenia in 2019 "made $300m in revenue" and "$178m of gross profit." I have also reviewed diligence memos prepared by Investor 2 personnel demonstrating Investor 2's understanding from the materials provided by HUDSON and Invenia that Invenia had over $250 million in cash in September 2020. These figures are not consistent with the genuine audit reports for Invenia from the years 2019 and 2020 produced by Invenia's Canadian auditor.

21. Investor 3, a venture capital firm based in Massachusetts that had previously invested in Invenia's Series A investment round, received similar misrepresentations from HUDSON in advance of the Series B fundraising round, during which Investor 3 invested

10

approximately $4 million in Invenia. For example, on December 24, 2020, HUDSON sent an email to Investor 3 representatives summarizing the positive outlook for Invenia that HUDSON wanted investors to believe, particularly with respect to large cash figures:

> General Update: Looking to end the year with around $400M CAD in cash, having added about half that from retained earnings on the year.

In another example from a December 29, 2020, email sent by HUDSON to an Investor 3 representative, HUDSON attached, among other things, "our audited statements for 2018 and 2019." I have compared both audit reports attached to HUDSON's December 29 email to the genuine audit reports produced by Invenia's Canadian auditors, and both audit reports attached to HUDSON's email were fabricated and manipulated in a number of material respects, including by materially inflating Invenia's cash and revenue figures. The 2019 audit report contained the same false cash and revenue figures as the draft audit report that HUDSON sent in September 2020 to the Investor 1 representative on Invenia's board of directors, as further described in paragraph 19 above.

22. Based on my training and experience, and my conversations with other law enforcement agents and officers, I know that fake, forged, or otherwise fraudulent documents are often used in fraud schemes and are often the hallmark evidence of such schemes. That is particularly true when the fake, forged, or fraudulent documents relate to a company's financial statements or financial performance.

23. Based on my investigation, review of documents and records, and information I have learned from witnesses and other law enforcement agents, I believe investors also received false, fraudulent, and misleading financial information about Invenia in the form of unaudited financial statements and balance sheets and profit and loss statements.

### HUDSON Used Other People's Identities to Commit the Fraud Scheme

24. Based on my participation in this investigation and my training and experience, there is probable cause to believe that HUDSON used the names and initials of real people and

businesses to distribute additional false information about Invenia to investors, including by using fake email accounts, invoices, and letters.

25.     For example, on January 8, 2021, an email account called CFO@invenia.ca emailed representatives of Investor 3 financial documents that reflected false, fraudulent, and misleading information. The email was signed by another individual working for Invenia, who has told the FBI that he did not send this email. The email copied HUDSON and a due diligence inbox for Invenia. The attached documents included tax returns for 2018 and 2019, which described Invenia revenue figures that I believe to be false because they are significantly higher than the revenue reported in the genuine audited financial statements for Invenia for those years that I have reviewed. In addition, the January 8, 2021 email attached three invoices purporting to be from Energy Company 1, reflecting financial performance and other information for Step2 Capital, Invenia's subsidiary, for the months of March 2020, June 2020, and September 2020. I believe these invoices were used as part of the scheme to defraud and contain significant false, fraudulent, and misleading information. Through this investigation, the FBI has obtained genuine invoices prepared by Energy Company 1 reflecting Energy Company 1's work for Step2 Capital, including for the months of June 2020 and September 2020, and there are material differences between what Investor 3 received and what Energy Company 1 prepared and sent to Step2 Capital. The Energy Company 1 invoice for the month of September 2020 sent to Investor 3 reflects that Step2 had approximately $266.96 million in transaction funds available with Energy Company 1 at that time. The actual invoice prepared by Energy Company 1 for that month and sent to Step2 reflects that it had approximately $138,078 in transaction funds available with Energy Company 1.

26.     There is probable cause HUDSON knew of these false and fraudulent representations in the fabricated Energy Company 1 invoices. HUDSON was copied on the email to Investor 3, he was the company's CEO at the time, and multiple investors have reported that HUDSON was their main point of contact at Invenia for investors and financial matters. In addition, the fabricated Energy Company 1 invoices attached to the January 8, 2021 email

included a telephone number ending in -2125 and an email address for an Energy Company 1 employee described in this affidavit as Individual 1.  Individual 1 was a real Energy Company 1 employee who managed the relationship with Invenia and Step2 Capital, and part of Individual 1's responsibilities included sending periodic invoices to Step2 Capital and Invenia.  Multiple Energy Company 1 witnesses, including Individual 1, have told the FBI that neither Individual 1 nor Energy Company 1 used the -2125 phone number listed for Individual 1 in the fabricated Energy Company 1 invoices.  Those witnesses have further confirmed that the email address for Individual 1 listed in the fabricated invoices was not used by Individual 1 and the domain within that email address was never used by Energy Company 1 at all.  A third-party provider for the -2125 telephone number in the fabricated Energy Company 1 invoices provided subscriber information to the FBI as part of this investigation.  According to the third-party provider, the -2125 number was activated in September 2020 and paid for by Matthew Hudson with a Visa card ending in -660.  The -2125 phone number account also included an email address with the same fake domain as the fake Individual 1 email address in the invoices described above, and it also included an account phone number ending in -7595.  I have reviewed emails reflecting HUDSON using a Visa account ending in -660 for what appear to be personal expenses and emails from HUDSON which often include an email signature listing the -7595 telephone number as his mobile number.

27. There is also probable cause that HUDSON knowingly and intentionally used the fake Individual 1 email address to further mislead Invenia investors and their representatives.  I have reviewed communications and records reflecting that in 2020 and 2021, a potential Invenia investor enlisted the help of a well-known professional services company to assist with diligence on Invenia.  As part of those efforts, representatives from the professional services company sought information directly from Energy Company 1 and ISOs to confirm financial information provided by Invenia and HUDSON.  I am aware of communications between HUDSON and the potential investor and the professional services company about this project.  Around this same time, HUDSON was also in touch with Individual 1's real email account to discuss issues

relating to Invenia's cash and collateral balances.  Yet in December 2020, HUDSON introduced the professional services team working on the diligence project for the potential investor to the fake Individual 1 email account, not Individual 1's genuine email address.  The fake Individual 1 email address proceeded to provide similarly false, fraudulent, and misleading invoices to the professional services team.  Later in February 2021, HUDSON emailed the genuine email account for Individual 1, telling him to ignore any outreach from anyone claiming to be from the professional services company because it reflected a security threat that may involve malware, despite the evidence showing HUDSON knew the professional services company was actually working on behalf of an Invenia investor.

28.     After its Series B investment, Investor 2 retained a U.S.-based consulting firm to conduct additional diligence relating to Invenia, including by seeking financial information about Invenia and Step2 from Energy Company 1 and ISOs directly.  After months of delay, in November 2021, HUDSON introduced the fake Individual 1 email address described above—not the real Individual 1 email address that HUDSON communicated with directly on other occasions—to the consultants working on behalf of Investor 2.  In April 2022, the fake Individual 1 email account sent an email copying HUDSON to Investor 2's consultants.  This email attached a letter that appeared to be signed by an Energy Company 1 representative and purported to provide balance information for cash held by Energy Company 1 on behalf of Invenia as of December 31, 2021.  The letter listed ISO 1's balance for Invenia as $170,122,888.27 and ISO 2's balance for Invenia as $194,152,475.85.  In July 2022, ISO 1 provided a written confirmation to Investor 2's consultants indicating that Energy Company 1's true cash balance with ISO 1 as of December 31, 2021, was only approximately $1,000,025.20.  In July 2022, ISO 2 provided a written confirmation to Investor 2's consultants indicating that Energy Company 1's true cash balance with ISO 2 as of December 31, 2021, was only approximately $783,847.61.

29.     Based on my training and experience, and my conversations with other law enforcement agents and officers, I know that impersonating other people and businesses is a tool used by people who engage in fraud schemes.

### *The Special Committee Investigation and HUDSON's Termination from Invenia*

30.     In or around April 2022, a special committee of Invenia's board started an investigation into certain issues relating to an investment from Investor 3 of approximately $26 million into Invenia as part of a Series B-2 fundraising round earlier that year. Based on this investigation, I believe that Investor 3's investment was based in part on false information relating to the participation of other investors in the Series B-2 round, including Investor 2. Specifically, an Investor 3 representative understood from conversations and materials provided by HUDSON that Investor 2 and others were also participating in the Series B-2 fundraising round. That representation was false: I have spoken to witnesses and reviewed evidence showing that Investor 2 and others did not participate in the Series B-2 fundraising round as Investor 3 had been led to believe, and I believe that forged signatures for representatives of Investor 2 and others appeared on Series B-2 investment documents provided to Investor 3. As a result of these inconsistencies and questions, Investor 3's approximately $26 million investment was returned to Investor 3. The special committee of Invenia's board retained firms to conduct an investigation of these and other matters relating to Invenia and HUDSON.

31.     Through this investigation, I have reviewed factual findings of the firms retained by the special committee based on their review of records and discussions with witnesses. Those factual findings included that (1) HUDSON caused "significant interference" in the special committee's investigation, including directing others "to actively obstruct the investigation" and "not to communicate" with the firm conducting the investigation; (2) HUDSON manipulated Invenia's IT infrastructure, including by using "ghost" email accounts; and (3) HUDSON manipulated and altered key financial documents and other business records, some of which were sent to potential and existing investors.

32. In October 2022, Invenia terminated HUDSON based on "gross and material violations of key Company policies and other inappropriate and/or unlawful activities that had a material adverse impact on the Company."

*Use of Interstate and Foreign Wires and the Purchase and Sale of Securities*

33. As part of the scheme to defraud described above, HUDSON caused multiple interstate wire transmissions, including:

   a. On or about December 28, 2020, Investor 2 sent approximately $7,426,001.97 from Investor 2's First Republic Bank account in San Francisco, California to Invenia's Royal Bank of Canada account in connection with Invenia's Series B investment round. This transfer used the FEDWIRE system, which is run by the Federal Reserve. The Federal Reserve has informed the FBI that all FEDWIRE transfers pass through servers in New Jersey and Texas.

   b. On or about March 15, 2021, Investor 2 sent approximately $19,775,000 from Investor 2's First Republic Bank account in San Francisco, California to Invenia's Royal Bank of Canada account in connection with Invenia's Series B investment round. This transfer also used the FEDWIRE system.

## CONCLUSION

34. Based on the foregoing, it is my opinion that there is probable cause to believe that HUDSON committed wire fraud, in violation of 18 U.S.C. § 1343. Accordingly, I respectfully request that a warrant for the arrest of HUDSON be issued.

//
//
//
//
//
//
//

## REQUEST FOR SEALING

35. I respectfully request that the Court issue an order sealing, until further order of the Court, the Criminal Complaint and all papers submitted in support of this Criminal Complaint, including the affidavit, and the docket. Such sealing is necessary to effectuate the orderly arrest of HUDSON and to guard against flight and destruction of evidence.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

*/s/ Deidre Lund*
DEIDRE LUND
Special Agent
Federal Bureau of Investigation

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 18th day of September 2025. This application and warrant are to be filed under seal.

_____
HONORABLE ALEX G. TSE
United States Magistrate Judge